IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

v.                                                          1:13-CR-165-1

JOSHUA CARDELL NEWELL,
                Defendant

-----------

UNITED STATES OF AMERICA,

v.                                                          1:15-CR-362-1

RONNIE DOUGLAS BURR, JR.
                Defendant

-----------

UNITED STATES OF AMERICA,

v.                                                          1:13-CR-214-2

JOHN ANTONIO LYONS, JR.
                Defendant

-----------

## <u>MEMORANDUM OPINION AND ORDER</u>

Catherine C. Eagles, District Judge.

 Ronnie Burr, Jr., John Lyons, Jr., and Joshua Newell are all incarcerated at FCI

Fort Dix in New Jersey, serving sentences imposed by the United States District Court

for the Middle District of North Carolina. They each move for a sentence reduction

pursuant to the compassionate release provisions of 18 U.S.C. § 3582(c)(1)(A).

 The defendants' evidence, which is undisputed by the government, establishes that

during the COVID-19 pandemic, the conditions of confinement at Fort Dix have been

extremely difficult. The prison did a poor job responding to the difficulties posed by this

contagious and potentially deadly virus in a congregate living situation. Despite having months of experience with the virus, prison officials made decisions in the fall of 2020 that allowed the virus to spread throughout the prison, and the number of cases at the prison skyrocketed over the winter—all while the number of cases at many other BoP facilities declined.[1] Mr. Burr, Mr. Lyons, and Mr. Newell each contracted the virus.

## I.      Compassionate Release

Courts do not have unfettered jurisdiction or discretion to modify criminal sentences. *United States v. Goodwyn*, 596 F.3d 233, 235–36 (4th Cir. 2010). A court may modify a sentence only when a provision in the Federal Rules of Criminal Procedure or a statute expressly permit it to do so. *See* 18 U.S.C. § 3582(c). Section 3582(c)(1)(A), often called the "compassionate release" provision, is one such statutory provision.

For a sentence reduction under § 3582(c)(1)(A) to be considered, the defendant must first satisfy the exhaustion requirement. *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021). Here, it is undisputed that these three defendant-inmates have exhausted their administrative remedies.[2] Their motions are appropriately before the Court.

---

[1] The Court is familiar with the trends in infection rates at BoP facilities from its regular review of the BoP website in connection with the scores of compassionate release motions filed this last year by inmates housed at various BoP facilities. *See also Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited July 27, 2021) (showing Fort Dix with substantially more reported inmate recoveries than any other facility). There are also many court orders reflecting the numbers at Fort Dix at various points in time. *See, e.g.*, *United States v. Kosic*, 18 Cr. 30(PAC), 2021 WL 1026498, at *3 (S.D.N.Y. Mar. 17, 2021) (discussing trends at Fort Dix).

[2] *See Burr*, Case No. 15-CR-362-1 (M.D.N.C), Doc. 69-2; *Lyons*, Case No. 13-CR-214-2 (M.D.N.C), Doc. 158 at 12; *Newell*, Case No. 13-CR-165-1 (M.D.N.C), Doc. 59-1 at 2–3.

2

Next, the defendant must show that a reduction is consistent with any applicable policy statements issued by the Sentencing Commission and that extraordinary and compelling reasons and the relevant § 3553(a) sentencing factors merit a reduction. *See United States v. McCoy*, 981 F.3d 271, 275 (4th Cir. 2020). The First Step Act did not amend the substantive standard for a sentence reduction under § 3582(c)(1)(A); courts must still find that extraordinary and compelling circumstances warrant the reduction in light of the § 3553(a) factors. There is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act. *See id.* at 282. The old policy statement applicable to motions brought by the BoP provides helpful but non-binding guidance as to the kinds of circumstances that might rise to a level supporting a sentence reduction. *Id.* at 282 n.7; *see* U.S.S.G. § 1B1.13 cmt. 1(A)–(D).

## II.     Extraordinary and Compelling Circumstances

The three defendants contend that the dire conditions they experienced at Fort Dix during the pandemic constitute an extraordinary and compelling reason to warrant a reduction in sentence. The Court agrees.

### A. Conditions at Fort Dix

Over 1,700 of the 2,879 inmates housed at Fort Dix have been diagnosed with COVID-19 in the last year and two have died.[3] As confirmed by this Court's regular

---

[3] *See COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.BoP.gov/coronavirus/ (last visited July 27, 2021) (noting that two staff members are presently positive and that 93 staff have contracted the virus); *FCI Fort Dix*, FED. BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/ftd/ (last visited July 27, 2021).

3

review of the BoP website and the case numbers reported in decisions of other courts, the number of positive cases skyrocketed last fall. Indeed, well over three-fourths of Fort Dix's cases were reported after November 30, 2020. *See United States v. Vega*, No. 89-CR-0229-2(JS), 2020 WL 7060153, at \*1 (E.D.N.Y. Dec. 2, 2020) (reflecting that as of November 30, 2020, the BoP reported that 303 inmates and 28 staff members at Fort Dix had tested positive for COVID-19 and that 47 inmates and 6 staff members had recovered from the virus).

The reasons for this explosion are clear from the evidence. The BOP (1) transferred a large number of inmates from another prison known to be in the midst of a serious COVID-19 outbreak to Fort Dix without an effective plan in place to avoid spreading the virus from transferring inmates to staff and inmates at Fort Dix;[4] (2) did not appropriately segregate or quarantine inmates,[5] and allowed COVID-positive inmates to use the same common areas as noninfected inmates;[6] (3) did not provide inmates with personal protective equipment, like masks or sanitizer,[7] despite housing inmates in overcrowded facilities without proper ventilation or sanitation;[8] (4) did not consistently

---

[4] *See Burr*, Case No. 15-CR-362-1, Docs. 72 at 1, 73-1 at 1 (noting the intake of some 150 inmates from FCI Elkton in October 2020 and the resulting outbreak).

[5] *See, e.g., Lyons*, Case No. 13-CR-214-2, Doc. 168-2 at ¶¶ 10, 12.

[6] *See, e.g., id.* at ¶ 10.

[7] *See, e.g., id.* at ¶ 13 (noting that inmates did not have access to hand sanitizer until the end of February 2021).

[8] *See, e.g., Newell*, Case No. 13-cr-165, Doc. 53 at 7–8.

4

log COVID-positive symptoms in inmates' records;[9] and (5) only enforced social distancing when third-party auditors were present.[10] The government has offered no evidence to contradict or undermine the defendant-inmates' statements and evidence. It has offered no evidence to place the BoP's apparently negligent decisions in context. *See generally Vega*, 2020 WL 7060153, at *3 (noting the failure of the BoP to prevent and control a COVID-19 outbreak at FCI Fort Dix); *see also United States v. Tazewell*, No. 07 CR. 1035 (RMB), 2021 WL 21980, at *4 (S.D.N.Y. Jan. 3, 2021) (noting that "[c]ourts have increasingly recognized the significant rise and outbreak of COVID-19 at FCI Fort Dix in support of their determinations of compassionate release.").

On top of these problems, the spread of the virus appears to have affected the prison's ability to provide consistent medical care. The BoP has not timely provided all inmates with medical examinations for COVID-19 related illnesses when requested and appropriate[11] or for non-COVID related illnesses when ordered.[12]

---

[9] *See, e.g.*, *Lyons*, Case No. 13-CR-214-2, Doc. 168-2 at ¶ 6; *see also United States v. Secchiaroli*, No. 17-CR-179-RJA, 2021 WL 614632, at *5 (W.D.N.Y. Feb. 17, 2021) (granting compassionate release motion where defendant housed at Fort Dix similarly disputed that he was "asymptomatic," as reflected in the BoP records).

[10] *See, e.g.*, *Lyons*, Case No. 13-CR-214-2, Doc. 158 at 5 (statement by Mr. Lyons that he and other inmates "watched as staff and orderlies were frantically posting signage, notices and floor markings," on August 18, 2020, the same date that "third party auditors and BoP executives" arrived to inspect the facility); Doc. 166 at 3 (noting that the day after the auditors left, "more than 260 inmates were forced to stand elbow-to-elbow awaiting mail call.").

[11] *See, e.g.*, *Lyons*, Case No. 13-CR-214-2, Doc. 168-2 at ¶ 14.

[12] *See* discussion *infra* p. 9–10 about the BoP's failure to provide an endoscopy or prescription medicine, as recommended by a physician outside the BoP for Mr. Burr's gastritis diagnosis.

5

Inmates like Mr. Burr, Mr. Lyons, and Mr. Newell are at the BoP's mercy while they are incarcerated. If the BoP does not provide or make available hand sanitizer or soap or masks, inmates cannot wash their hands or wear masks as recommended by the CDC. If the BoP places them in a space also occupied by inmates with COVID-19 symptoms or moves exposed inmates around without quarantining or testing them first, Mr. Burr, Mr. Lyons, and Mr. Newell cannot leave and go to a safer place. If an inmate experiences symptoms, that inmate cannot arrange for a COVID-19 test or obtain medical care on his own. In other words, the ability of the defendants to provide self-care within the environment of the correctional facility is substantially diminished. Well before the pandemic and the liberalization of the compassionate release statute, the Sentencing Commission recognized in its policy statement that an inability to provide self-care, could, in combination with other factors, constitute extraordinary and compelling circumstances. U.S.S.G. § 1B1.13 cmt. 1(A).

## B. The Defendants' Experiences

The conditions at Fort Dix over the fall and winter also had specific physical and mental consequences for Mr. Burr, Mr. Lyons, and Mr. Newell. They each contracted the virus.[13] While their experience with the virus varied somewhat and each appears to have recovered, as discussed in more detail *infra*, each experienced symptoms and either received or requested medical treatment. Mr. Newell had a very bad bout with the

---

[13] *See Newell*, Case No. 13-CR-165-1, Doc. 61-1 at 25; *Burr*, Case No. 15-CR-362-1, Doc. 83 at 17–27, Doc. 86 at 3; *Lyons*, Case No. 13-CR-214-2, Doc. 161 at 18; Doc. 168-2 at ¶¶ 6, 14.

6

disease that developed into a viral pneumonia,[14] and Mr. Burr was sent to the emergency room for acute coronary syndrome while infected with COVID.[15] Mr. Burr and Mr. Lyons also report that they are suffering from lingering symptoms.[16]

There was also an emotional toll from the infection. All three defendants have health conditions that would lead a reasonable person to have legitimate concerns about being at higher risk of severe complications given the unsettled nature of scientific knowledge about the virus. *See* discussion *infra*. Even before their positive diagnoses, the situation at Fort Dix in the fall caused emotional suffering and distress. Like almost everyone in or out of prison, they worried about contracting the virus. But unlike people who are not incarcerated, their risk and accompanying reasonable fears were heightened by the congregate living environment, *see FAQs for Correctional and Detention Facilities*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html (last visited July 27, 2021) ("Staff and people incarcerated in correctional and detention facilities are at greater risk for . . . COVID-19 . . . ."), and, more important here, by the BoP's actions and inactions and by their own lack of control.

Specifically, the defendants had to watch helplessly while the BoP appeared to mismanage inmate movements and failed to provide them with items to protect their own health, exposing them daily to unnecessary risks that threatened their well-being; they

---

[14] *See Newell*, Case No. 13-CR-165-1, Doc. 61-1 at 2–3.

[15] *See Burr*, Case No. 1:15-cr-362, Doc. 86 at 2.

[16] *Id*. at 3; *Lyons*, Case No. 13-CR-214-2, Doc. 168-2 at ¶¶ 6, 14.

7

lived in constant fear of exposure to a virus that has killed hundreds of thousands of people and raised additional specific individual worries based on their own health situations; and they ultimately each contracted the virus, causing additional fears and concern. As Mr. Burr put it, he has been very anxious "knowing that any inmate or staff he comes into contact with could be carrying his death sentence."[17]

Finally, the situation has been compounded by isolation from the outside world. Access to telephone calls has been so limited as to be almost non-existent during the pandemic, as the evidence about difficulties communicating with counsel shows.[18] After the BoP suspended all unmonitored legal calls,[19] inmates could only speak to their attorneys at pre-arranged times and there is uncontroverted evidence that it took multiple messages from counsel over several days before the BoP would arrange a short attorney-client call.[20]

### C. The Risk of Re-infection and Unknown Long-term Effects of COVID

Some courts have considered an inmate's recovery from COVID-19 as a factor weighing against finding extraordinary circumstances, as the government points out.[21] That makes sense in many cases, but it does depend on the circumstances. Indeed, as the Fourth Circuit has noted, "actually contracting COVID-19 can also provide a compelling

---

[17] *Burr*, Case No. 15-CR-362-1, Doc. 69 at 18.

[18] *See, e.g., Lyons*, Case No. 13-CR-214-2; Doc. 168-2 at ¶¶ 3–4.

[19] *See, e.g., Burr*, Case No. 15-CR-362-1; Doc. 81 at 16 n.6.

[20] *See, e.g., Lyons*, Case No. 13-CR-214-2; Doc. 168-2 at ¶¶ 3–4.

[21] *See Lyons*, Case No. 13-CR-214-2; Doc. 160 at 16–18 (collecting cases).

8

case for relief if coupled with a prison's inability to address the condition and circumstances calling for compassion." *United States v. High*, 997 F.3d 181, 185 (2021).

The state of scientific knowledge about COVID-19, including the likelihood and risks of reinfection, is unsettled. Indeed, there are already reports of new, highly contagious variants in the United States. *See About Variants*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last visited July 27, 2021). The CDC states that "the risk of reinfection also depends on the likelihood of re-exposure to infectious cases of COVID-19," and that "continued widespread transmission makes it more likely that reinfections will occur." *See Interim Guidance on Ending Isolation and Precautions for Adults with COVID-19*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html (last visited July 27, 2021) (cleaned up). Additionally, "the probability of [COVID] reinfection is expected to increase with time after recovery from initial infection because of waning immunity and the possibility of exposure to virus variants." *Id.*; *see also* WORLD HEALTH ORG., INTERIM RECOMMENDATIONS FOR USE OF THE PFIZER-BIONTECH COVID-19 VACCINE 6 (updated June 15, 2021) (advising continued use of masks even if fully vaccinated).[22]

The vaccination program does seem likely to reduce the risk going forward for those who get the vaccine; it will also likely reduce the risk for those who do not, as

---

[22] Accessible via https://www.who.int/news/item/15-06-2021-updated-pfizer-biontech-moderna-and-janssen-vaccine-recommendations (last visited July 27, 2021).

vaccinations of others reduce the number of positive cases and lower the overall risk of transmission. The BoP website confirms that vaccinations have begun at Fort Dix and that well over a majority of the inmates have been offered the vaccine.[23] Mr. Burr received his first dose of the vaccine on March 9, 2021,[24] and Mr. Lyons was offered and declined to receive the COVID-19 vaccination on March 19, 2021.[25] While there is no evidence that Mr. Newell has been vaccinated, the Court has no reason to believe he will not be offered the vaccine soon if he hasn't received it already.

At present, Fort Dix reports zero active cases.[26] The reasons for this are not clear from the evidence, but one can infer that this is in part because three-quarters of the inmates have already had the virus, in part because of vaccinations, and in part, one hopes, because prison officials have stopped the practices that led to the winter outbreak, at least for the time being.

The Court assumes the defendants' risk of contracting the disease again is relatively small, at least in the short run, given the low numbers at present, the vaccination program, and the degree of natural immunity associated with contracting the

---

[23] *See COVID-19 Vaccine Implementation*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited July 27, 2021).

[24] *See Burr*, Case No. 15-CR-362-1, Doc. 91.

[25] *See Lyons*, Case No. 13-CR-214-2, Doc. 173 at 6. The BoP records the government submitted include a vaccine consent form, which has a box that states, "I decline to receive the COVID-19 vaccination," and space under for the inmate and one witness to sign. *See id.* The form does not ask or provide space for the inmate to provide an explanation for declining the vaccine.

[26] *See Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited July 27, 2021).

10

virus. But it is not at all clear this risk will remain low. While one certainly hopes that the vaccine is the answer to all our pandemic prayers, that is not a certainty. This is a new virus and a new vaccine, and the spread of new variants is worrisome. Given the BoP's decisions leading to the significant outbreak at Fort Dix, the resulting inability to reduce transmission of the virus for an extended period of time, and the number of new and contagious variants now present in the United States, Mr. Burr, Mr. Lyons, and Mr. Newell remain at some risk of additional illness from COVID-19 in the future.

The long-term impact of a COVID-19 illness on the health of each inmate is also uncertain. There is no evidence in the medical records created and maintained by the BoP indicating that Mr. Newell, Mr. Lyons, or Mr. Burr are continuing to experience symptoms, but the CDC recognizes that there may be serious long-term complications, such as cardiovascular inflammation, respiratory abnormalities, kidney damage, and neurological problems. *See Post-COVID Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html (last visited July 27, 2021).

### D. Extraordinary and Compelling Circumstances

These facts go a long way to establish that the conditions experienced by these three inmates while incarcerated at Fort Dix during the fall and winter of 2020–2021 constitute extraordinary and compelling circumstances.[27] "A day in prison under the

---

[27] *See United States v. Hatcher*, No. 18 Cr. 454-10 (KPF), 2021 WL 1535310, at *4 (S.D.N.Y. Apr. 19, 2021) (granting motion for a sentence reduction after considering the "harsh conditions of confinement" and defendant-inmate's risk factors for severe illness or death from COVID-19); *United States v. Cruz*, No. 3:18-CR-81 (SRU), 2021 WL 1268253, at *6 (D. Conn.

11

current conditions is a qualitatively different type of punishment than one day in prison used to be." *Kibble*, 992 F.3d at 335 (Gregory, J., concurring). These defendants watched as the BoP made decisions that increased their risk of exposure to the potentially deadly virus, all while having limited contact with their families and attorneys. They each contracted COVID-19 under circumstances indicating BOP was unable to address the spread of the virus. To varying degrees and as evaluated in more detail *infra*, each defendant has health conditions causing them to worry and stress over the risk of severe illness. *See High*, 997 F.3d at 185 (noting that "actually contracting COVID-19 can also provide a compelling case for relief if coupled with a prison's inability to address the condition and circumstances calling for compassion."). The long-term effects from their encounters with COVID-19 remain unknown, and their risk of reinfection is increased by the likelihood that the BoP will repeat in the future the decisions that led to the outbreak last fall.

The Court does not find that any inmate at any prison where there were positive COVID-19 cases is entitled to a finding of extraordinary and compelling circumstances,

---

Apr. 6, 2021) (finding extraordinary and compelling circumstances existed after considering the defendant-inmate's "underlying medical conditions, the risk posed by Covid-19 outbreaks at Allenwood and the severity of punishment due to the Covid-19 pandemic"); *United States v. Mcrae*, No. 17 Cr. 643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) ("[A] day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing."); *United States v. Green*, No. CR TDC-10-0761, 2020 WL 2992855, at *3 (D. Md. June 4, 2020) ("[T]the Court finds that the historic COVID-19 pandemic, the fact that [the defendant] has been incarcerated in one of the detention facilities most profoundly impacted by COVID-19, and the fact that he has a health condition that may place him at high risk for serious illness collectively establish 'extraordinary and compelling reasons' within the meaning of 18 U.S.C. § 3582(c)(1)(A).").

12

much less a finding that a sentence reduction is appropriate. *See United States v. Chavis*, No. 1:18-CR-481-3, 2021 WL 2784653, at *4 (M.D.N.C. July 2, 2021). But the operational failures at Fort Dix and these defendants' personal experiences, as detailed *supra* and as further evaluated *infra*,[28] go well beyond the facts shown in compassionate release motions the Court routinely sees. These three inmates have each served part of their sentences under conditions that "undoubtedly increase a prison sentence's punitive effect." *Kibble*, 992 F.3d at 336 (Gregory, J., concurring); *see supra* note 27. Considering all of the evidence and on the specific facts here, the experiences of these three inmates constitute extraordinary and compelling circumstances under § 3582(c)(1)(A). *Chavis*, 2021 WL 2784653, at *4 (noting that circumstances that significantly increase the deterrent and punitive effect of a sentence can tip the scale in favor of finding extraordinary and compelling circumstances).

That is not, of course, the end of the inquiry. The Court must examine whether each defendant may be serving "a sentence that was 'sufficient but not greater than necessary' before the coronavirus pandemic" that no longer meets that criteria. *Kibble*, 992 F.3d at 335 (Gregory, J., concurring). Whether sentence reductions are ultimately appropriate and, if so, to what extent depends on the specific nature of the extraordinary

---

[28] The Court regrets the repetition, but as noted, there is a good bit of overlap in the facts which are relevant to the extraordinary and compelling evaluation and to the § 3553(a) analysis. *See United States v. Beck*, No. 1:13-CR-186-5, 2021 WL 260402, at *4 (M.D.N.C. Jan. 26, 2021) ("Decisions about whether a particular defendant's sentencing factors support release are made in light of his specific extraordinary and compelling reasons, not separate from those reasons.").

13

and compelling circumstances viewed in light of the § 3553(a) factors, which turn on facts generally unique to a particular defendant.

## III. Evaluation of Whether a Sentence Reduction is Appropriate

### A. Mr. Newell[29]

On November 6, 2013, Mr. Newell pled guilty to two counts of armed bank robbery and one count of carrying and using a firearm in connection with a robbery. Minute Entry 11/06/2013; Doc. 16. His presentence report calculated an advisory guideline range of 121 to 151 months for the bank robberies, plus the consecutive seven-year mandatory minimum sentence for the firearms charge. Doc. 32 at ¶ 72.[30] On January 29, 2014, the Court varied down to impose concurrent 97-month sentences for the two bank robberies, plus a mandatory consecutive 84-month sentence for the firearms charge, all to be followed by five years of supervised release. Minute Entry 1/29/2014; Doc. 21; Doc. 33 at 3. In arriving at this sentence, the Court considered Mr. Newell's almost non-existent criminal record, his commendable military service, and the fact that he appeared to be suffering from an untreated mental illness when he committed the offenses. Doc. 33 at 3. His sentence was affirmed. Docs. 28–29.

#### 1. Health Situation and Individual Circumstances

Mr. Newell's only chronic medical condition appears to be the sickle-cell trait. Doc. 61-1 at 23–24. The CDC has advised that sickle cell disease increases the risk of

---

[29] All docket citations in this section refer to Mr. Newell's case at Case No. 13-CR-165-1.

[30] The Court adopted the presentence report without change. Doc. 33.

14

severe illness from COVID-19, but there is nothing before the Court to indicate that sickle cell trait by itself increases risk. *See People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 27, 2021). He has a history of mental illness that has manifested in self-harm, Doc. 32 at ¶ 58, and an attempted suicide. *Id.* at ¶ 56. He has been diagnosed with an unspecified depressive disorder, paranoid personality disorder, and bipolar disorder. Doc. 61-1 at 23–24. While the risk to his physical health during the pandemic may not have been higher than that faced by other inmates, his mental health situation no doubt made the experience of living through the mismanaged outbreak worse for him than for many other inmates.

In February 2021, well into the outbreak, Mr. Newell was tested for COVID-19 based on exposure to the virus. *Id.* at 5–6. He entered exposure quarantine that same day, *Id.* at 4, and a few days later his test came back positive. *Id.* at 29. Initially, he felt no symptoms, *id.* at 4, but he later experienced fatigue and shortness of breath, stopped eating and drinking, and developed what care providers suspected to be "viral pneumonia." *Id.* at 2–3. Mr. Newell received IV fluids and was prescribed various steroids and medications to help with his symptoms. *Id.* at 2. Mr. Newell's brief indicates that he is "feeling better" and that his oxygen levels are returning to normal, Doc. 62 at 3–5, and a lay review of his medical records indicates that he is otherwise receiving adequate medical care. *See generally* Doc. 61-1. Even though he did not have risk factors for severe illness from the virus, he did experience a severe illness.

15

While he remains at risk of a second bout with the virus, that risk is not imminent. Given the vaccination program and the current low numbers of positive cases at Fort Dix at the moment, *see supra* at pp. 10–11, the situation seems to be improving.

As previously noted, Mr. Newell's experience in prison over the last year has been "a qualitatively different type of punishment" than it would have been without the pandemic. *Kibble*, 992 F.3d at 335 (Gregory, J, concurring). He has served his time at Fort Dix under very difficult circumstances, including an inability to control his exposure to the virus and the increased isolation from the outside world, his particular mental health issues, and his battle with a serious bout of COVID-19 "undoubtedly increase[d] [his] prison sentence's punitive effect." *Id.* at 336 (Gregory, J., concurring). Taken together, as previously stated, these constitute extraordinary and compelling reasons for sentence reduction under § 3582(c)(1)(A).

### 2. Mr. Newell's § 3553(a) Factors

The nature and circumstances of Mr. Newell's offense are very serious. On October 11, 2012, Mr. Newell entered a Winston-Salem bank with a firearm and a black ski mask pulled over his face. Doc. 32 at ¶ 4. He threatened the tellers and forced them to open the vault, from which he took $101,000. *Id.* On January 7, 2013, Mr. Newell entered a second Winston-Salem bank, again while carrying a firearm, and threatened to kill three bank tellers if they pressed any alarms. *Id.* at ¶¶ 5–6. Mr. Newell took $7,650 from the cash drawers and fled. *Id.* at ¶ 6. After a dangerous car chase, Mr. Newell crashed and was arrested. *Id.* at ¶¶ 7–8. The arresting officers recovered an AK-47, a handgun, a ski mask, gloves, and a bag containing $7,643. *Id.* at ¶ 7.

16

Outside the present offenses, Mr. Newell has no significant criminal history. *Id.* at ¶ 46 (reflecting a criminal history score of zero). He is a veteran and was honorably discharged from the United States Navy in April 2012. *Id.* at ¶ 67. The Court took both of these things into account in varying down when Mr. Newell was originally sentenced, Doc. 33 at 3, but they are also relevant now. He has been in custody since his arrest on January 7, 2013, Doc. 32 at 1, and he is presently scheduled for release in November 2025. *See Find an inmate*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited July 27, 2021). Mr. Newell is now 32 years old, Doc. 32 at 3, and he will be returning to the community relatively soon and as a relatively young man, even without a sentence reduction.

Mr. Newell has committed one disciplinary infraction while incarcerated, which occurred around when the fall COVID outbreak began. Doc. 57 at 1. He has completed 261 educational hours, largely on vocational programs, and he has spent the last two years with an HVAC work detail. *Id.* He has completed a non-residential drug treatment program, paid his special assessment in full, and paid over $8,000 towards his restitution. *Id.* A former work supervisor within the prison speaks highly of his progress and submitted a letter of support on his behalf. *See* Doc. 54 at 1. A glowing evaluation from his time in the Navy described him as "an established valuable member of the command" and "highly recommended" him for advancement. Doc. 63-1 at 1. The U.S. Probation office has investigated and approved Mr. Newell's proposed release plan to live with his parents in Winston-Salem. Doc. 57 at 2. The risk of recidivism is further reduced by the

17

supervision he will receive from the Probation Office and the detailed conditions of supervised release, including required mental health treatment. *See* Doc. 21 at 3–4.

Weighing all of these facts, the Court concludes that a sentence reduction is appropriate. He lived through a difficult time during the worst of the outbreak at Fort Dix, exacerbated by his mental health situation and the daily risks to his health under circumstances outside his control, and he actually contracted a severe case of the virus. He has undertaken substantial rehabilitative efforts while in custody, with a focus on earning a living through lawful means. He has significant positive support from his parents, *see* Doc. 32 at ¶ 50, he has no prior criminal history, and he honorably served his country.

But given the nature and circumstances of the offense, a serious punishment remains necessary. He robbed two banks, brandished firearms, and led law enforcement on a dangerous chase. The Court is not comfortable with a time served sentence, which would be approximately eight and a half years.[31] That is barely longer than the mandatory seven-year minimum required for Count 2, the brandishing count.

Considering all the facts, the Court concludes that the § 3553(a) factors, weighed in light of Mr. Newell's specific extraordinary and compelling circumstances, support a sentence reduction from 181 months to 172 months. Upon the possibility that the BoP will release him immediately with credits, and in order to ensure that everything is in

---

[31] To the extent Mr. Newell sought immediate release through the peak of pandemic, the Court has evaluated and determined that such relief is inappropriate based on the § 3553(a) factors.

place to assist him in the transition back into the community, the Court will stay execution of this amended sentence for 90 days. A separate judgment will be entered.

## B. Mr. Burr[32]

On February 5, 2016, Mr. Burr pled guilty to one count of conspiracy to distribute methamphetamine. Minute Entry 2/05/2016; Doc. 23. His advisory guideline range was 240 months—the statutory maximum. Doc. 29 at 33.[33] Based on his criminal history and the nature and circumstances of the offense, absent the statutory maximum, his advisory guideline range would have been 262 to 327 months. *Id*. On June 1, 2016, Mr. Burr was sentenced to 240 months of imprisonment, followed by three years of supervised release. Doc. 33. The Court concluded that a downward variance was not appropriate given Mr. Burr's repeated possession of dangerous weapons and violent conduct during the conspiracy. Doc. 40 at 26–27. The Fourth Circuit affirmed. Docs. 47, 48.

Mr. Burr filed a motion for compassionate release in October 2020, Doc. 69, which was denied based on the § 3553(a) factors. Doc. 71. He filed the instant motion for reconsideration in December 2020. Doc. 73. Reconsideration is appropriate in view of the strong and unrebutted evidence about the dangerous conditions at FCI Fort Dix.

### 1. Health Conditions and Individual Circumstances

Mr. Burr is now 50 years old. Doc. 29 at 3. He suffers from hyperlipidemia (high cholesterol), sleep apnea, umbilical hernia, unspecified abdominal pain, obesity,

---

[32] All docket citations in this section refer to Mr. Burr's case at Case No. 15-CR-362-1.

[33] The Court adopted the pre-sentence report without change. Minute Entry 6/1/16; Doc. 34.

19

hypertension, cognitive heart failure, gastritis, and gastroesophageal reflux disease. Doc. 86-1 at 30–31. Mr. Burr is currently receiving medication for his hyperlipidemia and hypertension, *see* Doc. 86-1 at 2, and the BoP provides a CPAP machine for his sleep apnea. *See id.* at 26. He does not appear to be receiving medication or treatment for his hernia, abdominal pain, obesity, or cognitive heart failure, but there is no suggestion he should be receiving medication or treatment for any of these conditions. *See, e.g.*, Doc. 83 at 1 (noting Mr. Burr "does not require any further testing or precautions" for his heart failure and umbilical hernia).

However, the BoP has not provided Mr. Burr with recommended medication and treatment for his gastritis. *See* Doc. 81 at 14–16. In December 2020, Mr. Burr was diagnosed with gastritis without bleeding and prescribed sucralfate and omeprazole. Doc. 86-1 at 2; Doc. 83 at 84. On December 10, 2020, a doctor outside of the BoP recommended that Mr. Burr receive an elective endoscopy, presumably for further investigation related to his gastritis diagnosis. Doc. 83 at 64. The BoP is aware of this recommendation, *see id.* at 48 ("Per papers follow up with gastro for endoscopy."),[34] but it has not provided Mr. Burr with the prescribed omeprazole nor had the BoP arranged for the endoscopy when briefing was complete in March 2021. When the BoP refused to provide the prescribed dosage of omeprazole, Doc. 86-1 at 5, Mr. Burr was forced to buy a weaker, over-the-counter version from the commissary to attempt to treat his gastritis in

---

[34] The records from the December 10 visit note that Mr. Burr was previously scheduled to receive an endoscopy, *see* Doc. 81-2 at 4 ("Pt was previously scheduled for endoscopy but never had it."), but there is no further evidence as to when that endoscopy was scheduled. Nor is there any explanation for why the endoscopy did not happen.

20

a way recommended by his health care provider. Doc. 86 at 6–7. And according to Mr. Burr's uncontradicted evidence, the endoscopy has not been provided because of COVID-19, Doc. 81 at 16, even though he has ongoing gastritis-related symptoms. *See* Doc. 86-1 at 5.

Mr. Burr tested positive for COVID-19 on October 29, 2020. Doc. 83 at 16. While his medical records are not completely clear, it appears the BoP checked on him daily after his positive test in late October. *See id.* at 17–27. He had shortness of breath on several occasions, *id.* at 21–22, and he reports that he also suffered from body aches, migraine headaches, diarrhea, fatigue, heart palpitations, chest pain, and reduced sense of tase and smell. Doc. 86 at 3; *see, e.g.*, Doc. 83 at 18. Mr. Burr had another positive test in mid-November. Doc. 86-1 at 32. While the BoP did not resume daily monitoring, Mr. Burr continued to receive regular medical attention for several weeks after the test. *See, e.g.,* Doc. 83 at 41, 106–11. Mr. Burr did not see a physician during that time, *see* Doc. 86 at 5, but there is no evidence that he had a particularly severe bout with the disease or that he was not provided appropriate care.

Like Mr. Newell, Mr. Burr lived through a terrible outbreak at Fort Dix during which he was forced to comply with rules and operations that exposed him to other inmates and staff with the virus. He was able to do very little to reduce his risk of getting sick, and he had obvious risks factors for complications, both increasing the difficulties of the situation. And then he ultimately contracted the virus during the outbreak. Mr. Burr did not experience severe illness as a result of his bout with the virus last fall and his risk of reinfection is low, but his experience still "undoubtedly increase[d] [his] prison

sentence's punitive effect." *Kibble*, 992 F.3d at 336 (Gregory, J., concurring). This is especially the case given the BoP's failure to provide recommended treatment and tests for his gastritis during the pandemic and the increased isolation from the outside world. Taken together, and as previously discussed, these facts constitute extraordinary and compelling reasons for a sentence reduction.

### 2. Mr. Burr's § 3553(a) Factors

At Mr. Burr's initial sentencing, the Court found that a downward variance was not appropriate, given the aggravated nature of the offense. During the conspiracy, which lasted several years and involved a dangerous manufacturing process, Mr. Burr possessed a dangerous weapon and threatened to harm other persons. *See* Doc. 29 at ¶¶ 8, 27 The Court weighed the § 3553(a) factors again in October 2020 when it considered his initial motion for compassionate release, and it again found that a shorter sentence was not appropriate. *See* Doc. 71 at 2–3.

On the one hand, the § 3553(a) factors have barely changed; Mr. Burr has still served less than half of his sentence and he has a serious disciplinary infraction for an assault. Doc. 89 at 1; Doc. 119. As the Court noted when denying Mr. Burr's original motion, which sought immediate release, a shorter sentence would not adequately take the nature and circumstances of the offense into account and "would essentially discount the enhancements appropriately applied in the guideline calculation." Doc. 71 at 3. "Waiving two-thirds of an appropriate sentence would result in a sentence that is not sufficient to punish and deter and that would not adequately address the seriousness of the crime." *Id.*

On the other hand, since his previous motion, Mr. Burr lived in extremely difficult circumstances for several months, well beyond the normally difficult conditions of confinement. He watched as the BoP mismanaged the movement of inmates, he was repeatedly exposed to higher risk of transmission of the virus in the face of several known risk factors for serious illness, and then he ultimately contracted COVID-19. Mr. Burr credibly reports suffering from many of the common symptoms, and as discussed *supra*, the long-term effects from the virus remain unknown. Moreover, Mr. Burr has faced delays in other medical treatment, as he has not received recommended medical care for his gastritis.

The circumstances of his incarceration have been exceptionally difficult, and there are some § 3553(a) factors that favor a reduction. During his presentence interview, Mr. Burr admitted to a long history of substance abuse, *see* Doc. 29 at ¶¶ 98–105, and his BoP records confirm that he suffers from persistent depressive disorder and unspecified trauma and stressor-related disorder. Doc. 86-1 at 30; *see also* Doc. 29 at ¶¶ 95–97. Despite using drugs and alcohol daily before his incarceration and his mental health conditions, Mr. Burr has some legitimate work history. Doc. 29 at ¶¶ 110–112. In the five years Mr. Burr has been incarcerated, he has completed over 400 hours of educational courses, including drug education and self-help courses. *See* Doc. 89 at 1. Finally, Mr. Burr has never served a lengthy sentence before, has the support of his family, and has a release plan approved by the probation office. *Id*. at 2.

Under these circumstances, the Court concludes that Mr. Burr's sentence should be reduced. Immediate release is not appropriate, given the nature and circumstances of

23

the offense and the § 3553(a) factors the Court has previously discussed at some length. *See* Doc. 71 at 2–3. But Mr. Burr has had an exceptionally hard time at Fort Dix, and the Court finds and concludes that it is appropriate to take 9 months off his sentence for the drug conspiracy. His sentence will be reduced to 231 months.

### C. Mr. Lyons[35]

On September 3, 2013, Mr. Lyons pled guilty to one count of conspiracy to interfere with commerce by robbery and one count of carrying and using, by brandishing, a firearm during and in relation to a crime of violence. Minute Entry 09/03/2013; Doc. 42. The brandishing count arose out of the use of a firearm during a robbery on January 20, 2013, *see* Doc. 32 at 15 (Count 22), and the conspiracy charge was based on various robberies between October 20, 2012, and February 6, 2013. *See id.* at 26 (Count 37); *see also* Doc. 42 at ¶ 2 (identifying counts to which defendant was pleading guilty). In exchange for several promises from the government, including the dismissal of the nearly two dozen remaining charges against him for his role in 12 armed robberies, Mr. Lyons agreed to significantly limit his right to appeal or collaterally attack his convictions or sentences in any post-conviction proceeding. *See* Doc. 42 at ¶ 5(c). His advisory guideline range for conspiracy to commit robbery was 121 to 151 months in addition to a seven-year mandatory minimum for the firearms charge. Doc. 92 at 1; Doc. 93 at 33.[36]

---

[35] All docket citations in this section refer to Mr. Lyons's case at Case No. 13-CR-214-2.

[36] The Court adopted the presentence report with changes to paragraphs 79, 86, 100, and 150, after determining a two-level enhancement for physical restraint applied instead of a four-level enhancement for abduction. *See* Doc. 92 at 1. These changes did not impact the guideline range calculated in the report. Doc. 67 at 18.

24

After weighing the nature and circumstances of the offenses, including the number of robberies, the use of multiple guns, the length of the conspiracy, and the number of victims, against the fact that Mr. Lyons was employed, had a supportive family, and withdrew from the robberies before the conspiracy ended, the Court sentenced him to 126 months imprisonment on the robbery charge plus the mandatory consecutive 84-month sentence for the firearms charge, for a total sentence of 210 months, to be followed by five years of supervised release. Minute Entry 11/21/2013; Doc. 52; Doc. 67 at 30–32. Mr. Lyons's appeal was dismissed based on his waiver. Docs. 82, 83. He also filed a § 2255 motion, contending his § 924(c) conviction was invalid because conspiracy to commit Hobbs Act robbery is not a crime of violence under § 924(c)(3). *See* Doc. 95 at 1. Because the predicate offense for his § 924(c) conviction was Hobbs Act robbery— not conspiracy to commit Hobbs Act robbery—his motion was denied. Doc. 152 at 3; *see United States v. Mathis*, 932 F.3d 242, 266 (4th Cir. 2019).

### 1. Health Situation and Individual Circumstances

Mr. Lyons is now 40 years old. Doc. 93 at 2. He has been incarcerated for approximately eight years. *See id.* at 1 (noting that Mr. Lyons has been detained since February 14, 2013). His projected release date is January 12, 2028. Doc. 166-1 at 4.

Mr. Lyons has been diagnosed with latent tuberculosis. Doc. 161 at 18. The CDC has not reported that latent tuberculosis is a risk factor for severe illness from COVID-19, but there is some evidence that the virus could activate latent tuberculosis and lead to hospitalization or death. *See United States v. Spencer,* No. CR 15-562, 2021 WL 565388, at *7 (E.D. Pa. Feb. 12, 2021) ("For individuals with latent TB, 'contracting COVID-19

could activate the bacterium, potentially leading to an accelerated and more severe form of the disease which could lead to hospitalization and rapid death.'") (citation omitted). Mr. Lyons asserts in his motion that he has "a history of Asthma." Doc. 158 at 2. The medical records before the Court do not corroborate this assertion, but in his reply brief, Mr. Lyons clarified that he was diagnosed with asthma as a child. Doc. 168-2 at ¶ 8.

Mr. Lyons tested positive for COVID-19 on December 21, 2020. Doc. 161 at 18, 24. According to the BoP's records, staff checked Mr. Lyons's vital signs daily for a week. *Id.* at 12. After Mr. Lyons denied experiencing any of the common COVID-19 symptoms on January 1, 2021, the BoP discontinued the daily medical assessments and advised him to report to medical staff if he became symptomatic. *Id.* at 1.

Mr. Lyons contends that he was, in fact, symptomatic and that he asked for a medical exam, which he never received. Doc. 168-1 at ¶ 3; Doc. 168-2 at ¶¶ 6, 14. He also asserts that he has ongoing pain in his back, is still suffering from fatigue, and has lost a significant amount of weight. Doc. 166 at 6.[37] Someone at BoP marked his illness as "resolved" on January 4, 2021, Doc. 161 at 18, but it is unknown who made this note. This note carries little weight, given the unknown source, the high possibility that it was not made by a health care professional, and the motives that prison officials at Fort Dix may have had to show that positive cases were being reduced.

On March 30, 2021, well after the completion of all briefing, the government filed supplemental evidence showing that Mr. Lyons was offered and declined the vaccine on

---

[37] The most recent BoP record depicting his weight is from July 7, 2020, before he was infected with the virus. Doc. 161 at 9.

March 19, 2021. Doc. 173 at 6. The government informed Mr. Lyons's attorney of the new development and provided counsel with a copy of the record. Doc. 172 at 1. The medical record does not say why Mr. Lyons refused the vaccine and he has not filed anything in response.

Mr. Lyons's refusal to reduce his own risk of reinfection by taking the vaccine, without proffer of any medical reason for that decision, undermines efforts taken by the BoP to ensure his safety and the safety of others. If he were to receive a sentence reduction to time served, his refusal to be vaccinated would increase the risk of transmission of the virus in the community. Several district courts have held that "an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances." *United States v. Baeza-Vargas*, No. CR-10-00448-010-PHX-JAT, 2021 WL 1250349, at *3 (D. Ariz. Apr. 5, 2021) (collecting cases).

If Mr. Lyons had alleged only that the ongoing risk from COVID-19 constituted extraordinary and compelling circumstances under § 3582(c), denial would likely be appropriate, given the current low numbers at Fort Dix and Mr. Lyons's unexplained refusal to take steps to protect himself and others. But as with Mr. Newell and Mr. Burr, there are other circumstances.

Mr. Lyons reasonably believed that he had risk factors for severe illness from COVID-19 and reports, in detail, witnessing BoP personnel at Fort Fix disregard CDC protocols, which increased the difficulties of the situation. *See, e.g.*, Doc. 168-2 at ¶ 10; Doc. 158 at 5. Mr. Lyons ultimately contracted the virus. Despite experiencing symptoms and requesting a medical evaluation, he did not see a doctor or other health

care provider before the BoP marked his case as "resolved" or by the time briefing was complete in March 2021. *See* Doc. 168-1 at ¶¶ 3–4. There is nothing to indicate that his physical symptoms were severe, but given his unmet requests for a medical evaluation, Mr. Lyons had every reason to be concerned about what treatment the BoP would provide if his symptoms worsened, particularly given his limited access to the outside world, including counsel. Indeed, counsel for Mr. Lyons left 11 voicemails with staff at Fort Dix before the BoP agreed to make Mr. Lyons available for a 30-minute phone call. *See* Doc. 168-2 at ¶¶ 3–4. His refusal to accept the COVID-19 vaccine, for reasons unknown to the Court, does not change the fact that institutional failures at Fort Dix increased the punitive effect of his sentence. Upon consideration of all the evidence, discussed here and earlier in this decision, the Court concludes there are extraordinary and compelling reasons for sentence reduction.

### 2. Mr. Lyons's § 3553(a) Factors

Outside the present offense, Mr. Lyons' criminal record consists of four convictions. Doc. 93 at ¶¶ 166–67. In May 1998, Mr. Lyons pled guilty to one count of possession of stolen goods or property and one count of carrying a concealed weapon, and he was sentenced to 45 months imprisonment, suspended, and 12 months of supervised probation. *Id.* at ¶ 166. In February 1999, Mr. Lyons was convicted of one count of felony second-degree murder and one count of felony assault with a deadly weapon with intent to kill or inflict serious injury. *Id.* at ¶ 167. He was sentenced to a total of 151 to 191 months in prison. *Id.* Mr. Lyons was released from prison on July 10,

28

2011, and he completed his post-release supervision on April 10, 2012. *Id.* He committed all these offenses when he was 17 years old. *Id.* at ¶¶ 166–67.

In October 2012, Mr. Lyons entered the conspiracy giving rise to the federal indictment against him and his co-defendants. *See id.* at ¶ 19. At the time, he was 31 years old. *See id.* at 2. Mr. Lyons participated in 11 robberies and one attempted robbery, each of which involved a firearm, between October 20, 2012, and January 27, 2013. *See id.* at ¶ 155. Mr. Lyons served as the getaway driver in most of these robberies, but he entered businesses and brandished firearms during several. *See, e.g., id.* at ¶¶ 25–27. Mr. Lyons also recruited other people to join the conspiracy. *Id.* at ¶ 48.

Mr. Lyons has served just over 50% of his 210-month sentence. *See* Doc. 158 at 11. While incarcerated, Mr. Lyons has earned his GED and completed a 2,000-hour housing apprenticeship and 500-hour drug abuse program, all while receiving positive work evaluations. Doc. 169. He has also paid over $2,000 towards his restitution amount through the inmate responsibility program. *Id.* The BoP reports that he is at low risk for recidivism. Doc. 166-1 at 4. If released, Mr. Lyons plans to live with his significant other, Benica LeChelle Kimbrough, in Durham, North Carolina. Doc. 168-2 at ¶ 15; Doc. 169 at 2. The probation office tentatively approved his proposed release plan, subject to the addition of a requirement that Mr. Lyons participate in a mental health treatment program to help his transition from prison back into the community. *Id.*

Weighing all of these facts, the Court concludes that a small sentence reduction is appropriate. Mr. Lyons, like Mr. Newell and Mr. Burr, has endured terrible living conditions during the last several months at Fort Dix. After contracting the potentially

29

deadly virus, Mr. Lyons's repeated requests for a medical examination due to his symptoms were met with silence by the BoP. His post-conviction record is overwhelmingly positive and demonstrates that Mr. Lyons is taking steps to gain legitimate employment upon release. A requirement for mental health treatment on supervised release will provide additional protection to the community and reduce the risk of recidivism.

While a sentence reduction is appropriate, reducing his sentence to time-served is not. [38] Mr. Lyons played a significant role in multiple robberies of convenience stores and other business establishments, each of which involved firearms. The statutory minimum sentence for brandishing a firearm during a crime of violence, to which he pled, is seven years. A time-served sentence would therefore provide almost no punishment for the actual conspiracy to commit the many other robberies. His bout with the virus was not severe, and there is nothing to indicate that he had other medical needs that were ignored during the pandemic. And he has a significant criminal history for violence. Weighing the § 3553(a) factors, in light of the extraordinary and compelling circumstances here, the Court concludes that a sentence reduction from 210 months to 204 months is appropriate.

## IV.    Conclusion

The operational failures by the Bureau of Prisons resulted in a massive COVID-19 outbreak at Fort Dix in the fall of 2020. Mr. Burr, Mr. Lyons, and Mr. Newell paid the

---

[38] To the extent Mr. Lyons sought immediate release through the peak of pandemic, the Court has evaluated and determined that such relief inappropriate based on the § 3553(a) factors.

price after they each were exposed to and ultimately infected by the COVID-19 virus and the conditions of confinement during this time were substantially more punitive than was contemplated at the time of sentencing. The specter of reinfection and new viral variants present real risks to the defendants. Each defendant has taken many positive steps toward rehabilitation. Taken as a whole, the defendants have shown that extraordinary and compelling circumstances and the § 3553(a) factors warrant reduced sentences.

Individual judgments will be entered.

It is **ORDERED** that:

1. Defendant Joshua Cardwell Newell's motion for compassionate release, Doc. 53, 13-cr-165-1, is **GRANTED** and his sentence will be reduced to 172 months;

2. Defendant Ronnie Douglas Burr's motion for reconsideration, Doc. 73, is **GRANTED** and his motion for compassionate release, Doc. 69, 15-cr-362-1, is **GRANTED** and his sentence will be reduced to 231 months; and

3. Defendant John Antonio Lyons, Jr.'s motion for compassionate release, Doc. 158, 13-cr-214-2, is **GRANTED** and his sentence will be reduced to 204 months.

This the 30th day of July, 2021.

_____
UNITED STATES DISTRICT JUDGE