IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 1:15-CR-362-1 |
| | ) | |
| RONNIE DOUGLAS BURR, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The defendant-inmate, Ronnie Burr, has filed a renewed motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) and asks the Court to reduce his sentence to time served or a probationary sentence for the remainder of his sentence. Mr. Burr has shown that the Bureau of Prisons has failed to provide necessary health care for him over an extended period of time, that extraordinary and compelling circumstances support a sentence reduction, and that the § 3553(a) factors weigh in favor of granting relief. His motion will be granted.

## I.      Procedural History

In February 2016, Mr. Burr pled guilty to one count of conspiracy to manufacture methamphetamine. Minute Entry 02/05/2016; Doc. 23. The Court sentenced him to 240 months imprisonment. Doc. 33 at 2.

In October 2020, Mr. Burr filed a motion for compassionate release. Doc. 69. The Court denied the motion based on the § 3553(a) factors. Doc. 71 at 2–3. Mr. Burr filed a motion for reconsideration in December 2020 based on new circumstances. Doc.

73. The Court found that Mr. Burr was not receiving appropriate medical care for all his medical issues, that he lived through "dire conditions . . . at Fort Dix during the pandemic" caused in part by BOP mismanagement, and that these facts constituted extraordinary and compelling reason to warrant a sentence reduction. Doc. 96 at 3, 13, 19–23. The Court weighed the § 3553(a) factors, including on the one hand the delays in medical treatment, including a recommended endoscopy for his gastritis, and the "exceptionally difficult" conditions of confinement during the pandemic, *id.* at 23, and, on the other hand, the circumstances of the crime and the length of the sentence remaining. *Id.* at 22. Considering these and other factors, the Court granted the motion in part, concluding that immediate release was inappropriate and reducing Mr. Burr's sentence by 9 months to 231 months. *Id.* at 23–24.

In May 2022, Mr. Burr filed the pending motion for compassionate release, asserting ongoing issues related to his medical care at FCI Fort Dix. Doc. 104. The Court appointed counsel, ordered the government to file all of Mr. Burr's medical records from the last year, allowed defense counsel to supplement the record with additional evidence or a supplemental brief, and set a briefing schedule. Doc. 106 at 2. This briefing has been completed, and the matter is ripe for resolution.

## II.     Crime of Conviction and Sentencing

Mr. Burr was convicted of a conspiracy to manufacture methamphetamine that lasted several years. *See* Doc. 29 at ¶¶ 8–31.[1] As the Court has previously discussed,

---

[1] The Court adopted the presentence report, Doc. 29, without change. Doc. 34 at 1.

Doc. 71 at 2, Mr. Burr was arrested and charged several times during the course of the conspiracy and returned to criminal conduct after his release on bond. He involved several other persons in a dangerous manufacturing process. Doc. 29 at ¶ 8. And he possessed a dangerous weapon as part of the drug offense, which he used to threaten other persons involved in the conspiracy. *Id.* at ¶¶ 11, 26–27.

In February 2016, Mr. Burr pled guilty to one count of conspiracy to manufacture methamphetamine. Minute Entry 02/05/2016; Doc. 23. His advisory guideline range was 240 months, the statutory maximum. Doc. 29 at ¶ 116. Absent the statutory maximum, his advisory guideline range would have been 262 to 327 months based on his criminal history and the nature and circumstances of the offense. *Id.*

In June 2016, the Court sentenced Mr. Burr to 240 months of imprisonment followed by three years of supervised release. Doc. 33 at 2–3. The Court concluded that a downward variance was not appropriate given Mr. Burr's repeated possession of dangerous weapons and violent conduct during the conspiracy. Doc. 40 at 26–27. The Fourth Circuit affirmed. Docs. 47–48.

### III.    Relevant Facts

Mr. Burr is now 51 years old. *See* Doc. 29 at 3. He has been in federal custody for almost seven years, since December 2015. *Id.* at 1–2. He is still housed at FCI Fort Dix and is scheduled for release in approximately eight and a half years. *See Find an Inmate*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc (last visited Nov. 28, 2022). He has a lengthy criminal history, but he has not previously served significant time in prison. Doc. 29 at ¶¶ 52–66.

## A. Health Conditions and Medical History

Before his incarceration, Mr. Burr received monthly disability payments from an unspecified source. Doc. 29 at ¶¶ 107, 113. The Court therefore assumes his health problems were significant, though the specific problems identified in the PSR were not obviously disabling. He had acid reflux episodes severe enough to require emergency room visits to rule out heart attacks. *Id.* at ¶ 92. He had high cholesterol. *Id.* While awaiting sentencing, he developed a need for hernia surgery and gallbladder surgery. *Id.* at ¶ 94.

During his time in custody, Mr. Burr has developed additional health issues. He has been diagnosed with heart failure, heart palpitations, dyspnea, tremors, asthma, pulmonary disease, dizziness, unspecified abdominal pain, gastroesophageal reflux disease, gastritis, chronic neck pain, sleep apnea, retinopathy, hypertension, hyperlipidemia, trauma and stress-related disorder, and persistent depressive disorder. Doc. 113-3 at 11, 63–65. In December 2021, some five years after he first developed gallbladder problems as noted in the presentence report, Doc. 29 at ¶ 94, he had his gallbladder removed due to acute cholecystitis. Doc. 113-2 at 6; Doc. 113-3 at 84, 99, 150–51. He takes medication for his hyperlipidemia, dizziness, hypertension, and pain and he is prescribed omeprazole for his gastroesophageal reflux disease. Doc. 117-2 at 3–4; Doc. 117-4 at 13.

Mr. Burr has reported ongoing abdominal pain during his incarceration. As noted *supra*, in 2016 he began experiencing abdominal pain seemingly related to his gallbladder while in a local jail. Doc. 29 at ¶ 94. Between December 2020 and

Case 1:15-cr-00362-CCE   Document 129   Filed 12/01/22   Page 4 of 25

September 2022, Mr. Burr went to the emergency department three times for abdominal pain, Doc. 83 at 54, 56, Doc. 113-2 at 58, Doc. 105 at 10, 23–24, and complained of burning abdominal pain at several BOP appointments and in multiple formal BOP complaints.[2] Doc. 113-2 at 9–10, 14, 30, 48; Doc. 113-3 at 43; Doc. 117-3 at 54; Doc. 113-5. He also lost a significant amount of weight, which he attributes to being unable to eat due to his pain. Doc. 113-2 at 14, 18; Doc. 113-3 at 8.

Mr. Burr's medical providers recommended an endoscopy at least as early as December 2020 and again in June 2021 and again in December 2021. *See* Doc. 83 at 48, 64;[3] Doc. 113-3 at 93, 127; Doc. 117-3 at 54. In July 2021, in deciding the earlier motion for compassionate release, the Court mentioned the BOP's failure to arrange an endoscopy as a factor supporting a finding of extraordinary and compelling reasons for a sentence reduction. Doc. 96 at 20–21. A year later, despite ongoing pain and another recommendation from a medical provider, no endoscopy had been performed.

At some point in August 2022, after the Court appointed counsel for Mr. Burr's renewed motion and required the government to respond, the BOP finally scheduled an endoscopy. Doc. 117 at ¶ 10. The endoscopy was not scheduled to happen until October

---

[2] In October 2021, Mr. Burr had a general surgical consultation in which the surgeon noted that Mr. Burr's epigastric pain was treated with omeprazole and had resolved. Doc. 113-2 at 153. But Mr. Burr sought medical care for severe epigastric pain in November and December 2021, *id.* at 9–10, 14, and was sent for emergency treatment related to his pain in December 2021. Doc. 105 at 10, 23–24.

[3] In the December 2020 medical record, the provider says that Mr. Burr "was previously scheduled for endoscopy but never had it." Doc. 83 at 56. A medical doctor who has reviewed Mr. Burr's records concluded that the endoscopy was recommended "at least as early as December of 2020." Doc. 113-4 at ¶ 27.

5

13, 2022. Doc. 123 at 1. When that date arrived, the procedure was cancelled because the BOP had not arranged adequate staff to take Mr. Burr to the place the procedure would be performed. *Id.* at 1–2; Doc. 124 at 1. The BOP now says it has rescheduled the endoscopy for December 2022. Doc. 124 at 1.

Mr. Burr's symptoms are consistent with a gastric ulcer. When a patient reports persistent epigastric pain, the first step the health care provider should take is to refer the patient to a gastroenterologist and order an endoscopy, which is the typical imaging tool used to diagnose a gastric ulcer. Doc. 113-4 at ¶¶ 24–25.[4] Gastric ulcers have a significant chance of being cancerous. *Id.* at ¶ 30. If discovered early enough, a cancerous gastric ulcer can be removed before it has metastasized. *Id.* But if discovered too late, the cancer will spread. *Id.*

Mr. Burr needs an endoscopy as soon as possible to confirm whether he has a gastric ulcer and, if he does, to biopsy any potential ulcer to determine if it is cancerous. *Id.* at ¶ 29. The BOP's failure to arrange for an endoscopy since December 2020 is far below the standard of care. *Id.* at ¶ 28.

The BOP has taken steps to provide some medical care for Mr. Burr's abdominal pain. He is prescribed omeprazole and takes the medication daily. Doc. 117-4 at 13; Doc. 113-2 at 153. The BOP has tested Mr. Burr for a H. Pylori infection, which is a common cause of ulcers. Doc. 113-3 at 82; Doc. 117-2 at 64; Doc. 113-4 at ¶ 24.

---

[4] These and other findings are based in part on the uncontradicted testimony of Dr. William Ameen, an experienced family practice medical doctor with relevant experience. *See* Doc. 113-4.

Case 1:15-cr-00362-CCE   Document 129   Filed 12/01/22   Page 6 of 25

In June 2021, Mr. Burr had an abdominal scan that showed he had multiple gallstones and a two centimeter cyst on his liver that was noted as "appearing" benign. Doc. 113-2 at 172. In October 2021, he had a surgical consultation related to gallstones, and the physician recommended ongoing observation and follow-up by a cardiologist for bradycardia. *Id.* at 154.

In December 2021, the BOP sent Mr. Burr for external emergency care after he complained of severe and burning abdominal pain. Doc. 105 at 10, 23–24. After transfer to another hospital, Doc. 113-3 at 131, and several tests and consultations, *id.* at 20, 118–19, 126, 131, 150, he was diagnosed with acute cholecystitis, which is inflammation of the gallbladder. Doc. 105 at 53, 56; Doc. 113-3 at 150–51. His gallbladder was removed. Doc. 105 at 9; Doc. 133-3 at 46.

Mr. Burr continued to report abdominal pain after his gallbladder was removed. A BOP doctor requested a HIDA scan, which was conducted in April 2022. Doc. 113-3 at 46, 87. The scan revealed an abnormality on Mr. Burr's liver and a CT scan was recommended. *Id.* at 87. He had a CT scan of his liver in July 2022, which, consistent with the earlier scan, Doc. 113-2 at 172, revealed a 2.4 centimeter mass that "is probably a cyst." Doc. 117-1 at 5. In May 2022, Mr. Burr refused a colonoscopy.[5] Doc. 117 at ¶ 6; Doc. 117-2 at 150.

---

[5] Mr. Burr says he refused the colonoscopy because he would have been housed in the solitary housing unit before the procedure with an inmate who stabbed someone in the prison. Doc. 113 at 11. The government has provided evidence that inmates do not know who they will share a cell with before a colonoscopy procedure. Doc. 117 at ¶ 8.

Case 1:15-cr-00362-CCE   Document 129   Filed 12/01/22   Page 7 of 25

The BOP has ignored three orders from medical providers that Mr. Burr receive an endoscopy and has failed to obtain an endoscopy for him even after a federal court pointed out the need well over a year ago. *See* Doc. 96 at 20–21. It scheduled the test only after it became clear the Court was taking another look at Mr. Burr's case, and then the BOP did not provide adequate staffing for Mr. Burr to receive the test.

There have been other gaps in treatment. In April 2022, a cardiac specialist recommended that Mr. Burr be evaluated by a pulmonologist. Doc. 117-2 at 4–5. His records show the BOP had "targeted" scheduling the pulmonology appointment by August 2022, Doc. 113-3 at 4, but Mr. Burr did not visit a pulmonologist until October 2022, months after it was recommended and only after these proceedings resumed. Doc. 124 at 6–7. And after Mr. Burr's gallbladder was removed, there is no evidence the BOP took him to a follow-up appointment with his external surgeon, even though the need for the appointment was clear in his discharge instructions. Doc. 105 at 16.

Mr. Burr has received appropriate care for other health issues. He has seen a cardiac specialist twice, Doc. 113-2 at 42, Doc. 113-3 at 84, and an EKG and chest x-rays detected no serious abnormalities. Doc. 117-2 at 237–38, 241–42. Based on the cardiac specialist's recommendation, Doc. 113-2 at 41, he received a pulmonary function test and had a cardiac monitor installed. Doc. 117-2 at 235–36. The monitor was meant to test for 72 hours and failed after 30 hours, but it detected no abnormalities and the cardiac specialist concluded that loop recorder heart monitoring was not justified under the

circumstances. Doc. 113-3 at 84.[6] Likewise, the pulmonary function test revealed a mild obstructive ventilatory defect but no serious issues; Mr. Burr had a significant response to the bronchodilator, and his lung volumes were normal. Doc. 105-1 at 2–3.

Mr. Burr tested positive for COVID-19 in the fall of 2020, and he reports that he experiences the effects of long-haul COVID-19. Doc. 81-1 at 81; Doc. 113 at 23–24. Mr. Burr received the COVID-19 vaccine. Doc. 113-2 at 116. At FCI Fort Dix, where Mr. Burr is housed, the BOP reports one inmate and five staff members are currently positive for COVID-19, and 1,346 inmates and 129 staff members have recovered since the start of the pandemic. *See COVID-19 Cases*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus (last visited Nov. 28, 2022). FCI Fort Dix reports that 3,316 inmates and 277 staff members have been vaccinated since the start of the pandemic. *See COVID-19 Vaccine Implementation*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus (last visited Nov. 28, 2022).

Mr. Burr has requested a consultation with a specialist over his concerns he has Parkinson's disease. Doc. 113-5 at 2. After an evaluation in April 2022, BOP medical staff concluded that although he had chronic tremors in both hands since 2019 and a family history of Parkinson's, he had no change in his walk, unsteadiness on his feet, or change in the tone of his voice. Doc. 117-2 at 16. Mr. Burr referenced muscle and nerve

---

[6] There is evidence that a loop recorder heart monitoring could detect potentially fatal heart arrhythmia. Doc. 113-3 at 84; Doc. 113-4 at ¶¶ 37–41. But the Court is not persuaded the failure to provide this monitoring is a violation of any standard of care, given the cardiac specialists' explicit consideration of this option. Mr. Burr's medical expert calls the monitoring "essential," but he does not say failure to provide it violates the standard of care. Doc. 113-4 at ¶¶ 37–41.

Case 1:15-cr-00362-CCE   Document 129   Filed 12/01/22   Page 9 of 25

twitching in his face and mouth in an April 2022 grievance, Doc. 113-5 at 2, but there is no evidence he raised these concerns at later medical consultations. *See* Doc. 117-2 at 1–9; Doc. 117-3 at 1–22. There is nothing to indicate the BOP's medical care for his tremors is below the standard of care.

Mr. Burr says the BOP has denied him mental health treatment. Doc. 113 at 13, 25. But the evidence shows he has refused mental health medication and courses on cognitive behavioral skills. Doc. 113-3 at 5.

### B. Other Facts

Mr. Burr has completed over 560 hours of educational courses, is working to complete his GED, and recently completed a nonresidential drug treatment program. Doc. 125; Doc. 120-5. He has a PATTERN recidivism score of low. Doc. 104-2. He has earned some credit against his sentence under the First Step Act. Doc. 126-1.

Mr. Burr has had two disciplinary reports while in prison. Doc. 125 at 1–2. In June 2020, he assaulted someone, losing significant good time credits and privileges. *Id.* at 2. In July 2022, he lost commissary privileges for a time because he gave or accepted money without authorization. *Id.*

Mr. Burr's release plan is to live with his father. *Id.* This is an acceptable plan according to the Probation Office. *Id.* Mr. Burr expresses optimism that "his education and apprenticeship in HVAC and building maintenance" will provide him with "a legitimate source of income and employment," Doc. 104 at 15, and he suggests that he will be able to access health care through insurance provided by an employer. Doc. 73 at 16. Mr. Burr has work experience as a machine operator and a manager, as well as past

employment at a manufacturing plant, but before his incarceration he had been unemployed since 2011. Doc. 29 at ¶¶ 107–110. At the time of his arrest, he was receiving $800 a month in unspecified disability benefits. *Id.* at ¶¶ 107, 113. He also reported owing an unknown amount of money for medical bills, and a review of his credit report showed he owed at least $116. *Id.* at ¶ 113.

## IV. Discussion

Courts do not have unfettered jurisdiction or discretion to modify criminal sentences. *See United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010) ("The law closely guards the finality of criminal sentences against judicial change of heart." (cleaned up)). A court may modify a sentence only when a provision in the Federal Rules of Criminal Procedure or a statute expressly permits it to do so. *See* 18 U.S.C. § 3582(c). Section 3582(c)(1)(A), often called the "compassionate release" provision, is one such statutory provision.

For a sentence reduction under § 3582(c)(1)(A) to be appropriate, the movant must satisfy the administrative exhaustion requirement, when invoked by the government. *See United States v. Muhammad*, 16 F.4th 126, 130 (4th Cir. 2021). Here, the government has not invoked the exhaustion requirement, so it is waived. *See* Doc. 116.

Section 3582(c)(1)(A) also requires that extraordinary and compelling reasons merit a reduction in sentence, that the reduction is consistent with any applicable policy statements issued by the Sentencing Commission, and that the relevant § 3553(a) sentencing factors do not counsel against early release. *See United States v. McCoy*, 981 F.3d 271, 275 (4th Cir. 2020); *United States v. High*, 997 F.3d 181, 185–86 (4th Cir.

11

2021). Even if the court finds extraordinary and compelling reasons support release, the court in its discretion may deny a defendant's motion after balancing the applicable § 3553(a) factors. *High*, 997 F.3d at 186.

### A. Extraordinary and Compelling Reasons

Mr. Burr contends that he is receiving inadequate medical care at Fort Dix and that this is an extraordinary and compelling reason warranting a sentence reduction to time served.[7] Inadequate medical care may be a relevant factor in finding extraordinary and compelling reasons under § 3582(c)(1)(A). *See United States v. Verasawmi*, No. 17-CR-254, 2022 WL 2763518, at *7 (D.N.J. July 15, 2022) (collecting cases); *United States v. Edwards*, No. 3-CR-234, 2022 WL 2866703, at *5 (D.D.C. July 21, 2022) (observing that inadequate medical care can justify a § 3582(c)(1)(A) sentence reduction if "the defendant's medical needs require release"); *see generally McCoy*, 981 F.3d at 284 (holding that courts may make their own determinations as to what constitutes extraordinary and compelling reasons as there is currently no binding policy statement).

There is no relevant policy statement defining the parameters or establishing a test for when inadequate medical care is an extraordinary and compelling reason by itself or

---

[7] Specifically, Mr. Burr contends that the BOP has failed to: (1) evaluate and monitor his ongoing and severe abdominal pain since 2020 or to arrange an endoscopy to determine the cause of pain, (2) monitor his heart palpitations, (3) arrange an evaluation by a pulmonologist for his shortness of breath, (4) arrange a follow-up appointment with his surgeon after his gallbladder removal, (5) arrange a CT scan of his liver after a significant abnormality was found by an external hospital, (6) refer him to specialists for evaluations of long COVID-19 and possible Parkinson's disease, and (7) provide mental-health treatment for depression and trauma-related stress disorder. Doc. 113 at 12–13.

in conjunction with other factors. Courts have generally been hesitant to second-guess BOP's medical care absent a strong showing that the care is inadequate.

The Western District of Virginia, for example, has found that "a two-week delay in getting" heart medication and not being "able to see a doctor to get a prescription renewed" for arthritis medication did not constitute extraordinary and compelling reasons for release. *United States v. Arey*, 461 F. Supp. 3d 343, 351 n.9 (W.D. Va. 2020). And earlier this year the Western District of New York denied a defendant's motion for compassionate release, stating:

> The Bureau of Prisons has consistently provided treatment, sent [the defendant] to specialists, scheduled him for medical procedures, and worked to address his complaints. Whether there has been negligence, misdiagnosis, or simple disagreement over proper treatment, nothing in the record demonstrates that [the defendant] is receiving medical treatment so inadequate as to warrant his release, particularly given the severity of his criminal conduct and the length of the sentence imposed.

*United States v. Martinez*, No. 10-CR-233, 2022 WL 1089671, at *3 (W.D.N.Y. Apr. 12, 2022). Similarly, in *United States v. Edwards*, the court observed that the BOP is required to "provide adequate medical care for a serious medical need—not optimal medical care or the care of an inmate's choosing," 2021 WL 3128870, at *6 (D.D.C. July 22, 2021) (cleaned up), and concluded that the BOP's denial of a cornea replacement did not qualify as inadequate care in part because it was not clear whether this care would be available to him outside of prison. *Id.* at *4.

But when there is a strong showing that the BOP's medical care is inadequate, a sentence reduction may be appropriate. Many courts have explicitly found that lengthy

13

and unexplained delays of needed medical care can be extraordinary and compelling circumstances and have granted compassionate release motions. For example, this Court, in *United States v. Beck*, found that the BOP's "grossly inadequate treatment" for invasive cancer was an extraordinary and compelling reason to grant release. 425 F. Supp. 3d 573, 580–81 (M.D.N.C. 2019). The District of Connecticut granted a compassionate release motion because the defendant, suffering from a severe spinal condition, had not received urgently needed surgery for over two years. *United States v. Almontes*, No. 5-CR-58, 2020 WL 1812713, at *6–7, 9–10 (D. Conn. Apr. 9, 2020). The Southern District of California granted compassionate release to a defendant suffering from multiple serious medical conditions because the defendant "ha[d] not received the consistent care, monitoring, and treatment required for her conditions, including a much-needed heart surgery which has yet to even be scheduled." *United States v. Robles*, No. 19-CR-4122, 2022 WL 229362, at *2 (S.D. Cal. Jan. 26, 2022). There are other examples. *See, e.g.*, *United States v. Derentz*, __ F. Supp. 3d. __, No. 15-CR-418, 2022 WL 2192931, at *5 (E.D. Pa. June 17, 2022) (granting compassionate release motion after finding unexplained and unjustified delays in treating the defendant); *Verasawmi*, 2022 WL 2763518, at *8, 11 (same, even though medical care improved once the district court intervened).

Here, Mr. Burr's evidence of BOP negligence and neglect is strong, compelling, and uncontradicted. The BOP's failure to schedule and follow through on completing an endoscopy for Mr. Burr for almost two years despite ongoing abdominal pain is a violation of the standard of care. Failure to timely diagnose a gastric ulcer could result in

14

a failure to diagnose and timely treat cancer, with potentially deadly results. In the face of three orders by medical professionals for this test, the BOP did nothing, in reckless disregard of Mr. Burr's health.

While counsel for the government suggests that Mr. Burr's endoscopy has not been considered urgent by treating health professionals, Doc. 116 at 13 n.7, the government provides no evidence to support this speculation. And all the evidence refutes counsel's conjecture: it shows, without dispute, that a gastric ulcer can be cancerous, an endoscopy is needed to determine if Mr. Burr has a gastric ulcer, Mr. Burr's health care providers have repeatedly ordered an endoscopy, the BOP repeatedly failed to follow through with arranging one, and failure to timely diagnose a cancerous gastric ulcer can be fatal. When the BOP finally scheduled the test, they failed to arrange appropriate staffing to take Mr. Burr off-site for the test, and then did not reschedule the test to occur for two more months. Doc. 123 at 2. Beyond explaining that "staffing issues" prompted the cancelling of the finally-scheduled endoscopy, the government has offered no evidence of why it took them years to schedule the endoscopy or why it did not arrange for adequate staffing once the test was finally scheduled.

This is not a case where there is a legitimate disagreement over whether a test is necessary and, at this point, urgent.[8] All of the evidence shows it is both.

---

[8] The government has not offered evidence, for example, that the initial delay in obtaining an endoscopy was caused by the difficulties in providing safe medical care during a pandemic, a problem that arose for many outside the prison context. *Cf. Helling v. McKinney*, 509 U.S. 25, 36–37 (1993) (holding that "realities of prison administration" are relevant in evaluating deliberate indifference to environmental harms). In any event, it is the repeated and ongoing

15

As the Court has previously noted, inmates with health issues are "at the BOP's mercy while they are incarcerated," Doc. 96 at 6, and they cannot independently schedule needed medical tests or care. While it is a positive that the procedure is finally scheduled for later this year, that is worth little weight, since the BOP already cancelled Mr. Burr's endoscopy once and may do so again.

The BOP has not ignored Mr. Burr's abdominal pain—the BOP has had him tested him for H. Pylori, taken him for emergency care for his abdominal pain three times, arranged for gallbladder surgery, managed to deal with scheduling and obtaining multiple HIDA scans and CT scans, and arranged for multiple external consults. It was willing to arrange a colonoscopy, which Mr. Burr refused even though it was recommended by BOP doctors. Doc. 117-2 at 150. BOP physicians have prescribed omeprazole to ease his symptoms. Doc. 117-4 at 13.

But the fact that the BOP has provided some care does not excuse its deliberate indifference to Mr. Burr's serious medical needs. An endoscopy, "the first step in the evaluation process" for persistent epigastric pain, Doc. 113-4 at ¶ 25, was recommended by medical providers at least as early as December 2020. If Mr. Burr has an ulcer and it is cancerous, the BOP's failure to arrange an endoscopy is likely to have serious, perhaps fatal, consequences for Mr. Burr. *Id.* at ¶ 30–31. The BOP's failure to obtain an endoscopy for Mr. Burr has caused pain and suffering unrelated to any penological

delay that is the constitutional problem here. *See Wilson v. Seiter*, 501 U.S. 294, 300 (1991) (noting that "[t]he long duration of a cruel prison condition may make it easier" to establish knowledge and intent).

16

purpose and raises a real possibility of late treatment for cancer with all the accompanying uncertainties and physical and mental consequences.

The uncontradicted evidence shows that the BOP has failed to obtain a medically-ordered test for over two years, that the failure could lead to a failure to timely diagnose and treat cancer, and that the failure is not an aberration, given the long delay in scheduling a consultation with a pulmonologist and the failure to schedule a follow-up visit after his surgery. Taken as a whole, the Court finds that the inadequate medical care and reckless disregard of Mr. Burr's health needs constitutes extraordinary and compelling circumstances.[9]

### B. Section 3553(a) Factors

In evaluating a compassionate release motion, the statute requires courts to "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). If the § 3553(a) factors weigh against a release, the Court has the discretion to deny the motion, regardless of the existence of extraordinary and compelling circumstances. *See United States v. Roman*, No. 21-3718, 2022 WL 363866, at *2 (6th Cir. Jan. 7, 2022). But if they support a sentence reduction, and the Court finds

---

[9] Mr. Burr contends FCI Fort Dix's continued mismanagement of COVID-19 and his heightened risk for severe complications from the disease constitute extraordinary and compelling reasons. But the BOP reports that at FCI Fort Dix one inmate and five staff members are currently positive for COVID-19, *see COVID-19 Cases*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited Nov. 28, 2022), and that 3,3316 inmates and 277 staff members have been vaccinated since the start of the pandemic. *See COVID-19 Vaccine Implementation*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus (last visited Nov. 28, 2022). Mr. Burr has not shown there is greater risk of contracting COVID-19 at FCI Fort Dix than in the community, where transmission remains fairly high.

Case 1:15-cr-00362-CCE   Document 129   Filed 12/01/22   Page 17 of 25

extraordinary and compelling circumstances, the Court can exercise its discretion to grant the motion. *See* 18 U.S.C. § 3582(c)(1)(A).

When the Court evaluated the § 3553(a) factors in August 2021, there were some factors that favored a sentence reduction. The Court reduced Mr. Burr's sentence by nine months based on the exceptionally difficult circumstances of his particular confinement resulting from BOP mismanagement during the worst of the COVID-19 pandemic and some § 3553(a) factors in his favor. Doc. 96 at 23–24. But the Court did not find immediate release appropriate at that time in light of the nature and circumstances of the offense. *Id.*; *see also* Doc. 71 at 2–3. There are new facts now, however, which require reexamination. Considering the new evidence, the applicable § 3553 factors, taken as a whole, weigh in favor of granting relief.

The nature and the circumstances of the offense, 18 U.S.C. § 3553(a)(1), and the guideline sentence for the offense, 18 U.S.C. § 3553(a)(4)(A), continue to weigh against a sentence reduction. Mr. Burr participated in a drug conspiracy which lasted several years and involved a dangerous manufacturing process. During this conspiracy, Mr. Burr possessed a dangerous weapon and threatened to harm other persons. *See* Doc. 29 at ¶¶ 8, 11, 27. These are serious aggravating factors, and when considered alongside Mr. Burr's lengthy criminal history, the guideline sentence was 240 months, the statutory maximum. *Id.* at ¶ 116. And the Court appreciates that a sentence reduction in this case could result in a sentencing disparity among Mr. Burr and other defendants with similar backgrounds who committed similar crimes. *See* 18 U.S.C. § 3553(a)(6). All of these factors counsel against reducing Mr. Burr's sentence.

18

Other factors favor a sentence reduction. Despite Mr. Burr's long history of substance abuse and mental health conditions, he has some legitimate work history. Doc. 29 at ¶¶ 108–12. And he has taken several courses to prepare him for HVAC and building maintenance work upon release. *See* Doc. 125. He also has family support and an approved release plan. *See id.* The assault he committed in prison occurred during the height of the pandemic, when prison circumstances were exceptionally difficult, and he has not committed any assaults before or since. He has completed over 560 hours of educational courses, including drug education and self-help courses. *Id.* Although he entered prison with only a sixth-grade education, Doc. 29 at ¶ 106, he has made progress toward his GED. Doc. 125. In August of this year, he successfully completed FCI Fort Dix's Non-Residential Drug Abuse Treatment Program. Doc. 120-5. Taken together, Mr. Burr's history and characteristics weigh in favor of release.

Mr. Burr has now served 83 months, almost seven years, in prison. While this is less than half of his current sentence of 231 months, it is a long time in prison, and it is well longer than any custody sentence Mr. Burr previously served. *See* Doc. 29 at ¶¶ 52–67. The conditions of confinement have also been far more punitive than this Court envisioned at his original sentencing and when it evaluated this factor some 16 months ago. Mr. Burr has spent much of this time with "severe and persistent" abdominal pain, Doc. 113-4 at ¶ 17, which the BOP has for the last two years failed to treat adequately. Doc. 96 at 20–21. He has been wholly dependent on the BOP for health care, and he has had to spend years fighting the BOP bureaucracy to get the care he needs, which as to the endoscopy has been unsuccessful. *See, e.g.*, Doc. 113-5 at 1–2

19

(Mr. Burr's complaint to the BOP in December 2021, asking for "assistance regarding the continued delays of an endoscopy procedure which should have occurred months ago"); *id.* at 8–9 (Mr. Burr's complaint to the BOP in June 2022, again asking for an endoscopy to be scheduled); Doc. 113-1 at 2 (complaints of severe and chronic epigastric pain); Doc. 113-2 at 14, 67 (same); Doc. 113-3 at 43, 94 (same); *id.* at 126–27 (medical record memorializing Mr. Burr complaining to a doctor about BOP's failure to arrange an endoscopy). Under these unique circumstances, a seven-year sentence is sufficient to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

Indeed, denial of a sentence reduction would affirmatively undermine respect for the law, as it would sweep under the rug the BOP's failure to live up to its constitutional duties to provide medical care for persons in its custody. As the Supreme Court stated decades ago in recognizing the government's obligation to provide medical care for those who it is punishing by incarceration, "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v Gamble*, 429 U.S. 97, 103 (1976). More recently, the Supreme Court stated:

> To incarcerate, society takes from prisoners the means to provide for their own needs. Prisoners are dependent on the State for food, clothing, and necessary medical care. . . . Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.

*Brown v. Plata*, 563 U.S. 493, 510–11 (2011).

20

Here, the government has failed to provide the minimum level of care required by the Constitution. Continued incarceration in the face of ongoing constitutionally deficient medical care is unjust punishment, not just punishment. *See Estelle*, 429 U.S. at 103–04 (noting that it violates the Eighth Amendment if the denial of medical care may produce "a lingering death" or pain and suffering with "no penological purpose"). The government has made no effort to offer evidence that the poor medical care is a result of inadvertence or good faith errors. *See Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).[10]

The conditions of confinement since 2020 also mean that the seven-year sentence Mr. Burr has served will provide adequate deterrence. 18 U.S.C. § 3553(a)(2)(B). Living through a pandemic in a mismanaged prison, *see* Doc. 96 at 7–8, 23, while obtaining inadequate medical care placing one's life at risk, *see* discussion *supra* pages 14–17, is highly likely to deter Mr. Burr from committing new crimes that might place him back under BOP control.

Mr. Burr's criminal history, while long, is overwhelmingly misdemeanors, Doc. 29 at ¶¶ 52–67, several of which reflect his ongoing substance abuse. *Id.* at ¶¶ 65–66. The BOP itself has recognized Mr. Burr's progress and rehabilitation: It currently classifies his danger to the public safety factor as "none" and is considering moving him to a minimum custody facility. Doc. 120-4; *see also* Doc. 104-2.

---

[10] The Court is not holding that an Eighth Amendment violation is necessary to grant a compassionate release motion. But if there is an Eighth Amendment violation, as here, surely that weighs in favor of a sentence reduction.

Case 1:15-cr-00362-CCE   Document 129   Filed 12/01/22   Page 21 of 25

The risk of danger to the public, § 3553(a)(2)(C), has been reduced by his completion of a significant drug treatment program to treat his longstanding substance issues, Doc. 120-5, and will be further reduced by the condition of supervised release requiring substance abuse testing and ongoing treatment. *See* Doc. 88; Doc. 33. Extending the term of supervised release, as is explicitly allowed by § 3582(c)(1)(A), and adding a term of location monitoring for the first several months of his release will add additional protections to the public. With these new conditions, this factor weighs in favor of a sentence reduction.

No party has suggested that further incarceration will provide Mr. Burr with additional educational or vocational training or correctional treatment in the most effective manner. *See* § 3553(a)(2)(D). The evidence is overwhelming that the BOP is not providing medical care in the most effective manner, another § 3553(a)(2)(D) factor the Court should take into account. Reducing Mr. Burr's sentence to time served will better serve this sentencing goal by allowing him to take control of his own medical care.

The Court must consider any applicable policy statements issued by the Sentencing Commission when analyzing the § 3553(a) factors. 18 U.S.C. § 3553(a)(5). There is currently no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act. *See United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020). The old policy statement applicable to motions brought by the BOP provides helpful but non-binding guidance as to the kinds of circumstances that might rise to a level supporting a sentence reduction. *Id.* at 282 n.7; *see* U.S.S.G. § 1B1.13 cmt.1(A)–(D). In that policy statement, the Sentencing Commission recognized that

22

sentencing relief may be warranted when the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt.1(A)(ii). Mr. Burr is suffering from chronic epigastric pain and is unable to provide self-care in prison. While it is not clear what exactly is causing his pain, or whether he is expected to recover from it, that lack of knowledge is attributable to the government; it is the government who has failed to provide Mr. Burr with the test needed to appropriately diagnose and treat his severe pain. This policy statement, although not binding, weighs in Mr. Burr's favor.

Section 3553(a) also calls for the Court to consider "the kinds of sentences available." 18 U.S.C. § 3553(a)(3). As previously noted, the compassionate release statute allows a court to reduce a term of imprisonment to time served, and when doing so the court "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). An extended period of supervised release with a period of location monitoring will restrict Mr. Burr's freedom, allow Mr. Burr to manage his medical care as needed, and provide additional support, resources, and supervision as he re-enters society.

Weighing the extraordinary and compelling circumstances present and the § 3553(a) factors, a sentence reduction to time served, accompanied by an extension of the term of supervised release and a period of location monitoring, is appropriate. The motion for compassionate release will be granted.

23

## V.    Conclusion

Mr. Burr has experienced severe and consistent epigastric pain while in prison. The first step to diagnose and evaluate chronic epigastric pain is an endoscopy, and Mr. Burr's medical providers have recommended that he receive an endoscopy multiple times since at least December of 2020. Mr. Burr himself has filed formal complaints with the BOP asking them to schedule this procedure. Yet the BOP has failed to successfully arrange for Mr. Burr to get an endoscopy, a violation of the standard of care. This failure has caused pain and suffering unrelated to any penological purpose and raises a real possibility of death from an undiagnosed and untreated cancerous ulcer. It also constitutes extraordinary and compelling circumstances warranting a reduction in Mr. Burr's sentence to time served. Considering the § 3553(a) factors as a whole, immediate release is appropriate. The Court will extend Mr. Burr's supervised release period to five years and add a term of location monitoring.

It is **ORDERED** that the defendant's motion for compassionate release, Doc. 104, is **GRANTED** as follows:

1. The defendant's sentence is **REDUCED** to time served.

2. This order is **STAYED** for 15 days to allow the BOP, the Probation Office, and the defendant to make appropriate arrangements for his release.

3. The period of supervised release is **EXTENDED** to five years and all conditions imposed at sentencing remain in place.

4. The defendant **SHALL** be on location monitoring for the first 90 days of his supervised release and **SHALL** abide by all conditions and terms of the

24

location monitoring.  At the direction of the probation officer, the defendant **SHALL** wear a location monitoring device which may include GPS or other monitoring technology and follow all program procedures specified by the probation officer. The defendant **SHALL** pay for the location monitoring services as directed by the probation officer.

5. An amended judgment will be entered separately.

This the 1st day of December, 2022.

_____
UNITED STATES DISTRICT JUDGE

Case 1:15-cr-00362-CCE   Document 129   Filed 12/01/22   Page 25 of 25